# Lessee of Robert Dunning, William Dunning, John Dunning, Ezekiel Dunning and Mark Dunning *against* James Caruthers.

Blunston's licenses partake more of warrants than locations, and have all the essential parts of a warrant: But an unreasonable delay in not pursuing claims under either, will be equally fatal to the right.

Some difference in equity between one laying a right on an improvement begun by another, knowing that fact, and the case of a stranger to such improvement. Verdicts in ejectment are not conclusive, but have more or less weight from circumstances; and none are stronger than where valuable improvements have been made in confidence of the verdict and judgment thereon.

EJECTMENT for lands in West Pennsbro' township, Cumberland county.

The action was tried before SMITH, J. at Carlisle on the 5th May 1803. YEATES, J. declined taking any part in the cause, having been counsel for the defendant in a former ejectment for these lands, which was tried on the 23d May 1782 at Nisi Prius.

A verdict being found for the plaintiff, SMITH, J. reported the substance of the evidence given on the trial; a motion for a new trial having been made.

The plaintiff claimed under two warrants: one in the name of William Armstrong, dated 16th April 1743, for 150 acres in West Pennsbro' township, on the dry spring, adjoining lands of Ezekiel and James Dunning. On this warrant 7l. 10s. was paid, and on the receiver general's books, this entry was made " 24 " November 1744. Transferred to Robert Dunning per order " of secretary, and said to belong to Robert Dunning."—But there appeared no assignment or indorsement on the warrant.

The other warrant was in the name of Robert Dunning aforesaid, *the grandfather of the lessors of the plaintiff. It was dated 19th November 1743, and called for 200 acres in West Pennsbro' township including his improvement between the lands of . . . . . [So in the original.] Interest to commence from 1st March 1737. On the date of the warrant 5l. was paid to the receiver general. It appeared by the field notes of Thomas Cookson, esq. late deputy surveyor, that a survey was made on Dunning's warrant on the 22d March 1743–4. To which was subjoined this memorandum made by Charles Morse, a clerk of Mr. Cookson's, " this claimed by

[*14

"John Calhoon's heirs, under a grant from the proprietaries "under the hand of Mr. Blunston."

On the 9th April 1750, the said Robert Dunning devised to his son John, the father of the lessors of the plaintiff, the tract of land adjoining Ezekiel Dunning and John Davison, and directed 100 acres of it to be cleared and deeded in the office. And on the 19th June 1764, a survey of 219 acres 145 perches was made by William Lyon for John Dunning, under the two warrants.

It was marked on the draft, that "173 acres 132 perches "shewed by the pricked line in the draft, was formerly surveyed "for Robert Dunning under his warrant, which Thomas Cal-"hoon claims a right to, under an old grant to his father John "Calhoon. The residue being 46 acres 13 perches lying on the "N. W. of the old tract, is added at the request of John Dun-"ning."

Parol testimony was adduced to prove, that in 1757 or 1758 the said John Dunning erected a small cabin on the land and put a black man and his wife in it. The ruins of another cabin near the head of a spring called Calhoons, were then visible. Some years after, Dunning sold the lands to James Foley for 400l. and was to make him a patent; but if he could not do so, he was to pay him for his improvement. Foley built a house and barn, and cleared according to one witness 10 or 12 acres, according to another witness 12 or 15 acres, and according to a third witness between 20 and 30 acres. Dunning forced Foley out of possession, and the improvements of the latter were valued: he made some additional clearing, and died at the flying camp in 1776.

The defendant claimed under a license from Samuel Blunston, esq. to John Calhoon, dated 17th February 1734–5, "to "settle and improve 200 acres of land on Robert Dunning's "spring, next below James Dunning, to be bounded on the up-"per side with said James, on the lower side with Ezekiel Dun-"ning, on the east and west with the barrens, and hereafter to "be surveyed to the said John Calhoon, on the common terms "other lands in those parts are sold."

*It appeared, that shortly afterwards, the said John Calhoon procured one James Johnston to assist him in making an improvement on Dunning's spring: they grubbed 3 acres and chopped and burnt it, fit for ploughing. During this period, they lodged at the house of Robert Dunning in the neighbourhood, (he being the brother-in-law of Calhoon) who was well satisfied with their making the improvements, and laid no claim to the land. Calhoon agreed before he went off, with a neighbour to plough the land cleared, and mawl rails to inclose it, and gave him a mare in part payment. He then returned to his farm in Chester county; and by his will dated 19th September 1752, devised all his real estate to his wife Rebecca to be disposed of among his children, declaring thereby that he had

never sold his land in West Pennsbro' to Robert Dunning; and died in the same year.

A declaration in ejectment to April term 1755 by the heirs of John Calhoon against John Dunning, was found amongst the records of the Court of Common Pleas, at Carlisle. A blank affidavit of the service on the tenant was indorsed thereon, but not filled up; nor was there any docket entry of it. But the testimony given by James Smith, esq. on a former trial in May 1782 stated, that he drew the declaration, and that in the term of April 1755, John Dunning called on him at Carlisle, and told him he had been served with the ejectment; that he would not employ an attorney to appear for him, as he knew Calhoon had a grant from Mr. Blunston, and every one told him he had the eldest and best right, that he would quit the possession and give Mrs. Calhoon no more trouble; and he actually did quit the possession of the premises accordingly.

On the 20th July 1763, Rebecca Calhoon conveyed the land to her son James Calhoon in pursuance of the powers in her husband's will: and John Dunning having again obtained possession, the said James brought an ejectment against him to July term 1768; and in April term 1773, judgment was obtained against the casual ejector, the defendant's attorney refusing to confess lease entry and ouster, agreeably to the common rule. Previous hereto on the 19th June 1764, a survey of 219 acres 145 perches was made by John Armstrong deputy surveyor under Blunston's licence. And a caveat being filed by Thomas Calhoon, in behalf of the devisees of John Calhoon, against the said John Dunning, the board of property made a decision thereon upon the 24th November 1766; wherein after reciting that it appeared to the board that William Armstrong had received back the money which he had paid on his warrant in 1773; that John Calhoon had obtained Mr. Blunston's licence in 1734–5, and in the same year made his *settlement on the land; that Armstrong the first warrantee had been [*16 told by Robert Dunning, that the land belonged to John Calhoon, and he had purchased from him; that Dunning's survey was caveated in Cookson's field notes; that the widow of John Dunning had opposed a survey attempted to be made under the licence; that Robert Dunning died in 1750, and John Calhoon in 1752; that after Calhoon's death, John Dunning took possession, and built a cabin on the lands; that the devisees of John Calhoon, brought an ejectment against him, and obtained the possession; and that John Dunning, after buying in Armstrong's warrant, had obtained a new survey in 1764; the board directed, and ordered that the survey be returned on the licence granted by Blunston, and a patent be issued thereon; and that the survey made on Armstrong's or Dunning's warrant ought not to be accepted.

On the 10th December 1773, James Calhoon entered into articles with James Caruthers, the defendant in the present suit;

[Dunning's Lessee *v.* Caruthers.]

by which the latter was to receive possession of the lands, and to pay therefor 900l. by instalments. The former covenanted to defend the title against the claim of John Dunning, and to repay the money and deliver up the outstanding bonds, in case of his recovery; all the consideration was paid.

John Dunning brought a new ejectment against James Calhoon to April term 1774, which being removed into the Supreme Court, came on to trial, after Dunning's death, at *Nisi Prius* at Carlisle, on the 23d May 1782, when a verdict was given for the defendant, and judgment was rendered thereon.

On the 5th September 1788, a re-survey was made by Samuel Lyon, of 250 acres, and 53 perches, and on the 23d April 1789, a patent issued to James Calhoon.

It further appeared by parol testimony, that in the intermediate period, between the trial in 1782, and the commencement of this ejectment in 1796, the defendant had made many valuable improvements on the lands in question. He built a stone house and barn near the head of the spring called Calhoon's, a large double house and saw mill, and cleared a considerable quantity of land.

The defendant's counsel having moved for a new trial, SMITH, J. recommended, that the argument should be had before the whole court in Philadelphia, without prejudice to either side, which was mutually agreed to.

And this term, the cause having been argued at great length, and with much ability, on its merits, by Messrs. W. Tilghman and Watts, for the plaintiff, and Messrs. E. Tilghman and Duncan, for the defendant,—

*17] *SHIPPEN, C. J. delivered his opinion as follows:

The defendant's title is first, in point of time. On the 17th February 1734–5, John Calhoon obtained a license from Samuel Blunston, to settle and improve 200 acres of land on Robert Dunning's spring, bounded as is mentioned therein; to be surveyed to the said John Calhoon, on the common terms. Shortly after this, Calhoon enters upon the land, clears three or four acres, and employs a person to fence and plough it. He then returned to Chester county, where he remained several years, without pursuing his improvement, or getting any survey made.

In March 1743–4, Robert Dunning obtained a warrant for the same land, and got a survey made in a short time after. The plaintiff claims title under this warrant and survey; under the idea, that Calhoon had abandoned his claim, by not following it up in a reasonable time.

As to the nature of Blunston's licences, they were issued under a special commission from the proprietaries to Samuel Blunston, a gentleman resident on the banks of the Susquehannah, to encourage the settlement of the country. Most of the early titles over the Susquehannah, originated in these licences.

The legal effect of these licences, has been differently con-
strued, by the different counsel.   By some, they are likened to
locations, by others, to warrants.    I take it, they are not strictly
analogous to either, but certainly partake more of warrants than
locations.    They have indeed all the essential parts of a warrant,
except in the single circumstance of the purchase money not be-
ing previously paid ; they contain a direction to make a survey,
equally with a warrant ; and the truth is, that it was the constan
usage of surveyors, to make surveys under them, in the same
manner as under warrants, and such surveys were uniformly ac-
cepted in the office.

But if in the present case, Calhoon had got a warrant instead
of a licence, if the fact be, that he abandoned his claim by an
unreasonable delay in not pursuing it, it will be equally fatal to
his right, whether founded on a warrant or a licence.

Was there then such an abandonment, as entitled another per-
son, to obtain a title to it by warrant and survey ?   The length
of time that elapsed, before Calhoon took any step to confirm
his right, would certainly in an ordinary case, deprive him of his
right.    But a considerable question arises, whether under the
circumstances of this case, and considering who the party was
who opposed his right, and in what manner he obtained an ad-
verse right, these shall take the defendant out of the common
case ?

Robert Dunning appears to have been privy to Calhoon's
original right.   Calhoon lodged at his house, which was in the
*neighbourhood, when he made his clearing.   And there is   [*18
some difference in equity, between a man's laying a right
upon land, even in the case of an improvement, where he knows
an improvement to have been begun by another, and where a
perfect stranger lays such a right.   Still if there was no other
circumstance in the case, and there had been an evident dere-
liction, this perhaps alone would not have served the orignal
taker up.

But in this case there is a much stronger circumstance.   Ro-
bert Dunning, when he applied for a warrant in 1743, not only
knew of Calhoon's prior right, but in some measure recognized
it, and was guilty, as appears to me, of a deception upon the
office.   It seems there was a prior warrant for this same land,
taken out by one William Armstrong, whom he prevails upon to
surrender his warrant to him, upon an allegation that he could
acquire no right under it, on account of Calhoon's having an ear-
lier right under a licence from Blunston.   This warrant being
then out of his way, he has recourse to an absolute falsehood,
by asserting, that he had purchased from Calhoon, his earlier
right.    If these facts are true, his title was founded in fraud,
and can have no support either in law or equity.

It is however asserted, that this deception and this fraud do
not appear in the evidence, except from the decision of the Board
of Property ; and that facts recited in the minutes of that decision

4 YEATES—2

not appearing to have been authenticated upon oath, ought to have but little weight.    This board had certainly no strictly judicial authority, but it was a tribunal known to the laws.    And what has great weight with me, the presiding member of it was a gentleman of acknowledged abilities as a lawyer, and well known to myself from a long acquaintance, and thorough knowledge of him, to be a person not only of great humanity, but of the strictest veracity and sterling integrity.    This possibly may tend to work a stronger conviction in my mind, of the truth of what he certifies, than it may in the minds of men, who knew him not so well; but to me, it is irresistible.  Under this persuasion, I cannot doubt, but there has been some foul play in this transaction, and cannot ease my conscience, without giving my voice in favor of a re-hearing of the cause.

Much has been said on both sides, on the effect of a former verdict.    It is certainly not conclusive in the case of ejectments, as in other actions; but it deserves more or less weight from circumstances.    No stronger circumstance can appear to give it weight, than what has happened in the present case.    The contract for the purchase of this land was indeed made before the contest had received a decision; but after the cause had been solemnly tried in the highest court of judicature in this state, and a verdict given in favour of the title of the present defend-*ant, he had every reason to suppose the dispute was at rest.    In confidence of that verdict and judgment, he makes very valuable improvements, by erecting costly buildings, and other additions to the value of the land.    This, though not a reason to divest another of a clear right, yet ought reasonably to create a bias in favour of a former verdict; and ought particularly to weigh with the court, not to change the possession, if they discover a reasonable doubt that justice has not been done in the last trial.    This doubt, I acknowledge, exists in my mind.    I therefore give my voice in favour of a new trial.

Smith and Brackenridge, justices, concurred.

Verdict set aside, and a new trial awarded.