HOLT (O'REILLY v.). See Case No. 10,563.

HOLT (ROBINSON v.). See Case No. 11,955.

HOLTON (THOMPSON v.). See Case No. 13,958.

HOLTSCLAW (UNITED STATES v.). See Case No. 15,384.

---

## Case No. 6,648.

### HOLTZAPPLE et ux. v. PHILLIBAUM.

[4 Wash. C. C. 356.] [1]

Circuit Court, E. D. Pennsylvania. April Term, 1823.

EJECTMENT — TRESPASSER — IMPROVEMENTS — LACHES—PRESUMPTION OF CONVEYANCE—ENTRY—ADVERSE POSSESSION.

1. Improvements made by a disseisor or trespasser on the land of another, cannot give him a title at law to it, nor in equity, unless in a case of gross fraud on the part of the real owner.

2. Under what circumstances a conveyance may be presumed. What amounts to an abandonment of an equitable title to land. The consequence of such abandonment; and how the title may be resumed and secured after abandonment.

3. If the first settler or warrant holder abandon, and another settle on the land and afterwards abandon it also; the first claimant, by going on and perfecting his title will prevail against the other.

4. Settlement and improvement not necessary to give validity to the title derived under a Blunston's license.

5. Evidence of an intention to abandon, ought to be stronger in some cases than in others. Quaere. Can a man be presumed to have abandoned, after survey returned and purchase money paid.

6. Laches in a warrant holder in perfecting his title, will not affect him as against the proprietary, unless he took advantage of it by granting a vacating warrant. But a person having a legal title, who goes forward and perfects it, will prevail against the elder equitable title, which is obnoxious to the charge of laches;

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States. under the supervision of Richard Peters, Jr.. Esq.]

unless the former had notice of the prior equitable title; and this court will in ejectment notice these titles.

7. Difference between abandonment, and a want of due diligence in perfecting the equitable title.

8. Statements made of facts, by the board of property in their decisions, are not evidence of the facts so stated.

9. What circumstances will authorize the presumption of a conveyance.

10. The same length of possession in the plaintiff in ejectment, which in the defendant would amount to a bar, is in the plaintiff a sufficient title for him to recover on. To avoid the force of it, the other side must prove that he brought suit, or made an actual entry on the land, within the time the law prescribes.

[Cited in Bradley v. West, 60 Mo. 35.]

11. Plaintiffs' adverse possession commenced in 1773; defendant's ancestor died in 1777, leaving the defendant a minor, who came of age in 1793, but did not bring the ejectment upon which he recovered the possession, till the year 1805, which was too late; the act of limitations of 1785, requiring the action to be brought within ten years after the disability removed.

12. To avoid the bar of the statute of limitations in ejectment by entry, the opposite party must prove that he made the entry with intent to claim the possession, and that he did some act indicative of such intention, or that he declared that he did enter for the purpose of claiming or taking possession.

[Cited in Armstrong v. Risteau, 5 Md. 274; Hood v. Hood, 25 Pa. St. 420; City of Pella v. Scholte, 24 Iowa, 296; Hinman v. Cranmer, 9 Pa. St. 41; Lingenfelter v. Richey, 62 Pa. St. 125.]

13. Proof that the party claiming the land "attended every year on the land, prosecuting and claiming his title to it, that the witness was with him every year on the land, but could not remember what he said when he was there," is not sufficient evidence of a legal entry to avoid the statute of limitations.

Ejectment [by the lessee of Holtzapple and wife against Phillibaum] for two hundred and fifty acres of land in Cumberland county. The plaintiffs' title commenced with a Blunston's license, dated the 17th of February, 1734–35, granted to John Calhoun to settle and improve two hundred acres of land on Robert Dunning's spring, next below James Dunning, to be bounded on the upper side by James Dunning, and on the lower by Ezekiel Dunning, and on the east and west by the barrens, to be surveyed to him on the common terms. In 1735, Calhoun, who then lived in Chester county, went to the land accompanied by a labourer, who assisted him in clearing about three acres of ground. He then paid a man in the neighbourhood to grub, enclose, and plough the land, and then returned to Chester county, where he died in 1752, having never visited the land after the time above mentioned, or made any further efforts to improve or settle the land in dispute. It appears by the field notes of Cookson, the surveyor, that he commenced surveying lands lying on the west side of the Susquehanna in the year 1742. It was proved that whilst Calhoun was engaged in making the small improvement before mentioned, he staid at the house of Robert Dunning, his brother-in-law, and that the latter was acquainted with the title under which Calhoun claimed the land. John Calhoun, by his will, devised this tract of land to his wife, with a power to give it by deed or will to any of his children; and in pursuance of the power, she conveyed the land to her son, James Calhoun, by deed bearing date the 20th of July, 1763. The defendant claimed under two warrants, the one dated the 16th of April, 1743, for one hundred and fifty acres, lying on the dry spring adjoining the lands of Ezekiel and James Dunning (being the same tract as that described in the Blunston's license) granted to William Armstrong; and the other, dated the 19th of November, 1743, granted to Robert Dunning for two hundred acres, including his improvements, between the lands of ———; interest and quit rents to commence from the first of March, 1737. Upon the first warrant £7. 10s. were paid in part of the purchase money, and on the receiver general's books, under date the 23d of November, 1743, Robert Dunning is debited for two hundred acres, including his improvement between Ezekiel and James Dunning, and credited £5. On the same books, under date the 24th of November, 1743, is found the following entry. viz. "William Armstrong Dr. to Robert Dunning £7. 10s. to land for which Armstrong paid this sum is said to belong to Dunning. and for which said Dunning is to have credit, by order of the secretary." Upon Cookson's field book, under date the 22d of March, 1764, and headed "Robert Dunning," are found the courses and distances of a tract of land, which the defendant insists are the bounds of the land in dispute, but which is not conceded by the plaintiff. It did not appear, however, that a regular survey of the land, agreeable to these notes, was ever made out and returned to the land office. On the 19th of June, 1764, a survey was made of the two warrants of Armstrong and Dunning, for John Dunning his son and devisee of Robert Dunning, who died in the year 1750. Upon an application to the deputy surveyor who made the above survey, to survey the Blunston license for the heirs of Calhoun. the above survey was returned for the heirs of Calhoun, as well as for Dunning, both on the same day. Calhoun immediately caveated the survey for Dunning, and in 1766, in the absence of Dunning, who had been duly cited to appear, the board of property, upon certain facts stated in the decision as having been proved to the satisfaction of the board, ordered the survey for Calhoun to be accepted, and a grant to issue thereon, and decided that the survey for Dunning ought not to be accepted. Some time in the year 1764, John Dunning entered into an agreement with James Fo-

ley to sell this land to him for £500, the said Dunning stipulating to repay whatever sum he might receive from Foley, and also to pay him for any improvements he might make on the land, in case he, Dunning, on account of the Calhoun claim, should be unable to make to Foley a good title. Foley entered upon the land, made considerable improvements on it, and was, some time in the year 1767 or 1768, forcibly turned out of the possession by John Dunning, who then took the possession. In the spring of 1755, John Dunning placed some negroes on the land to improve it, and before harvest of that year he removed them, and never put them on the land afterwards. Almost as soon as possession was thus taken by Dunning, an ejectment was served upon him by Calhoun, as proved by James Smith, Esquire, the counsel for Calhoun; who states further in his deposition, that Dunning informed him that the ejectment had been served; that he did not intend to contest the plaintiff's title, being advised that the Blunston license gave the plaintiff a preferable title to his, and that he should give up the possession, which he accordingly did; in consequence of which no further proceedings were had in the suit. Upon the entry of John Dunning, in 1768, the Calhouns again served an ejectment upon him; and in 1773, the jury being empanelled to try it, Dunning, by his counsel, refused to confess lease, entry, and ouster; upon which, a judgment was entered against the casual ejector, and upon a habere facias possessionem, the plaintiff was put into possession. After which, and in the same year, he sold the land to James Caruthers (under whom the plaintiffs claim), who entered upon the land, made many valuable improvements on it, and paid the whole of the purchase money about the year 1782. John Dunning then brought an ejectment in 1774 against Calhoun, and in 1782 a verdict and judgment were entered for the defendant. In 1796 another ejectment was instituted by the heirs of John Dunning (he having died in 1775) against Caruthers; and in 1803 the plaintiff obtained a verdict, which was set aside; and on a new trial, which took place in 1805, verdict and judgment were rendered for the defendant. Another ejectment was brought by the Dunnings, in the same year, against Caruthers, which was first tried in 1812, when a verdict was rendered for the plaintiff. A new trial was granted, which took place in 1813, when a similar verdict was rendered, and a motion for a new trial was refused. The cause was then taken before the supreme court, upon an exception filed to the charge of the judge who tried the cause; and the judgment of the court below was affirmed in the year 1817. The present ejectment was then brought in this court. John Dunning left six sons, the youngest of whom, Mark, was, at the death of his father, about

eighteen months old; so that he came of age in the year 1793. Ezekiel, another of the sons, was also a minor at the death of his father, and came of age in 1791. No proof was given of the ages of the other sons. It was proved by James Davidson, that William Dunning (one of the sons of John Dunning, who was also empowered by his brothers to act for them), attended every year on the land, prosecuting and claiming his title to the land. That he was with him every year on the land, but he could not remember what he said when he was on the land.

The objections made to the plaintiffs' title, were:

1. That from the total neglect of this land by Calhoun and his family, and after so many years, the jury ought to presume that Calhoun did, by some instrument, or by parol (which was sufficient in those days), transfer his right in this land to Dunning.

2. That the terms on which a Blunston's license gave a title were, settlement and improvement; which not having been complied with by Calhoun, he lost his right: but if not so, still his making an improvement in 1735, and immediately abandoning it, and his laches in not following up his equitable title, by procuring a survey of the land, and paying the purchase money, or even asserting his title for twenty years, from 1735 to 1755; amounted in law to an abandonment, and enabled Dunning to appropriate it in 1743 and 1744, as he did, by the two warrants in the former year, and his survey in the latter. That a Blunston's license is no more than a simple location, by application, and may be as easily abandoned. Whart. Dig. p. 398; No. 195, p. 399; Nos. 198, 199, p. 383; No. 16, p. 386; Nos. 60, 61, p. 392; No. 127, p. 386; No. 55, p. 390; Nos. 95, 102, p. 393; No. 131, p. 396; No. 167; Graham v. Moore, 4 Serg. & R. 467; 3 Serg. & R. 383; Co. Litt. 245, 246; 2 Yeates, 462; 5 Serg. & R. 181; Dunning v. Caruthers, 4 Yeates, 13.

3. That whether there was, strictly speaking, an abandonment or not, still the laches of Calhoun deprives him of his priority in favour of Dunning. who appropriated the land by the warrants in 1743, and the survey in 1774.

4. The title of Caruthers is merely an equitable one, standing solely on the articles of agreement between him and Calhoun, whereby the latter agreed to sell this land to the former, and on receiving the purchase money, to make a conveyance; but no conveyance has been produced.

5. The plaintiff, in his opening, having stated, that he should rely upon possession in Caruthers, from 1773 till 1805, when the suit was brought by the heirs of John Dunning, which turned Caruthers out of possession, it was answered, that the limitation could not begin to run till 1789, when the state granted the patent to Calhoun, before

which, the title was in the state, against which the statute could not run: but that, at all events, though a suit was not brought till 1805, still it is proved by James Davidson that an entry was made yearly, and that they had the authority of the supreme court in the case of Carothers v. Dunning, 3 Serg. & R. 373, for saying, that, if the entry so proved was, in the opinion of the jury, made for the purpose of claiming the possession, it is sufficient. The plaintiff, in his opening, having relied upon the recitals in the decision, or order, of the board of property, on the caveat; the defendant's counsel denied that those recitals were ever prima facie evidence.

By the plaintiffs' counsel, it was answered: 1. That the presumption of a deed is never made, but where a long and uninterrupted possession, consistent with the title, is made out in proof; which is not this case. But even if it were, the presumption may be rebutted, and is so in this case, by the surrender of the possession to Calhoun in 1755.

2 and 3. A Blunston's license resembles a warrant in every respect, except payment of a part of the purchase money. 4 Yeates, 17. Settlement and improvement is not necessary to constitute a title under such a license; nor did the conduct of Calhoun in leaving his improvement, amount to an abandonment of his title. 3 Serg. & R. 379. The circumstances proved in this case do not amount to an abandonment. 2 Yeates, 83. From Cookson's field notes, it appears that no surveys were made over the Susquehanna, prior to 1742; from which time only can Calhoun become chargeable with neglect. But, even if an abandonment by him may be presumed, it can give no title to Dunning, whose warrant is founded in fraud and deception, practised on the land office, in asserting an improvement in 1737, when no improvement was made; and in asserting also to Armstrong, that he had obtained Calhoun's title; by which falsehood, he induced Armstrong to assign his warrant to him. These facts are proved by the recitals in the decision of the board of property, and are clearly to be inferred from all the circumstances of this case. If this be so, Dunning can have no title in law or equity. 4 Yeates, 13. Besides, if Calhoun be chargeable with abandonment, so also is Dunning; and upon this ground, likewise, he is prevented from impeaching the title of Calhoun. In addition to all this, he was a purchaser with notice of Calhoun's title, and therefore can have no title to oppose to ours upon the ground of abandonment, or of laches to postpone the prior right of Calhoun.

4. The possession of Caruthers, from 1773 to 1817, upwards of forty years, without his title having ever been questioned by the Calhouns, is quite sufficient to create a legal presumption that a conveyance was made to him by Calhoun. 4 Term R. 682; 1 Caines, 84; 7 Johns. 5; 10 Johns. 377; Ricard v.

Williams, 7 Wheat. [20 U. S.] 109; 6 Bin. 416; [Hepburn v. Colin Auld] 5 Cranch [9 U. S.] 262; 2 W. Bl. 1228.

5. An entry to avoid the bar of the statute of limitations must be with intent to claim the possession, and the person must either claim it by some declaration to that effect, or by some act similar to those stated by Lord Coke in his comment on section 401 of Littleton's text. The evidence of Davidson falls far short of proving such an entry. 3 Bl. Comm. 175; 7 East, 311; 4 Johns. 402; Runn. Ej. 202; Clerke v. Pywell, 1 Saund. 319. Length of possession sufficient to bar an ejectment is sufficient also to give a title to the plaintiff. 3 Johns. 207; 13 Johns. 367; Adams, Ej. 76; 1 Salk. 421; 5 Serg. & R. 239.

Binny & Chauncey, for plaintiff.
Condy & Alexander, for defendant.

WASHINGTON, Circuit Justice (charging jury). The counsel for the plaintiff, and the defendant, having each, in his turn, pressed upon the attention of the jury, considerations which ought not to affect the merits of this case, but which are calculated to excite improper prejudices, it becomes my duty to notice them in the first instance, and to remove them out of your way. Each side has triumphantly boasted of the success which the Calhoun and the Dunning title has, at different times, obtained in the judicial controversy which has subsisted for nearly seventy years. To state that matter in a few words, it seems to stand thus: Calhoun claims credit for two refusals by the Dunnings, to face the Calhoun title in a court of justice, first in the year 1755, and afterwards in 1773. Two verdicts, and two judgments, and one decision of the board of property in favour of that title. The Dunnings offset against this, three verdicts and one judgment, a new trial refused by the judge who last tried the cause, and his charge to the jury approved of, and affirmed by the supreme court. I very much question whether either party has much cause to claim a triumph over the other. If the jury can weigh these claims, and, with any degree of accuracy, say which preponderates, it is more than I can. I think that, instead of making the attempt, it will be quite as well to pass them by, and to decide this cause uninfluenced by the past successes of either party. Each side has endeavoured to enlist the feelings, if not the judgment of the jury, in his favour; by speaking of, and magnifying the improvements made upon this land by Caruthers, on the one side, and by Foley and John Dunning on the other. In addition to this, an effort has been made by the counsel for the Dunning title to stigmatize Caruthers as a purchaser of a law suit, and as such, it is contended, no mercy should be shown him. Although Caruthers expected at the time he purchased this land, that the controversy was not at an end, he had, nevertheless, a

legal, as well as a moral right, to purchase from a person, not only in possession, but in possession under the judgment and process of a court of justice. On the other hand, Foley was, in some measure, a lite pendente purchaser. He bought, in March, 1794, with a full knowledge of Calhoun's title: the survey was made in June, and the caveat filed in July of the same year, before Foley had received a deed, paid the purchase money, or commenced his improvements. But really these matters, and the improvements connected with them, have nothing to do with the issue which you are sworn to try, and which involves the titles of these parties, and not their conduct in other respects, or their improvements. Improvements made by a disseisor, or trespasser, upon the land of another, can never give him a title at law, nor in equity; unless, perhaps, in a case of gross fraud on the part of the real owner, and under very peculiar circumstances. As to the titles under which these parties claim, they are soon stated. The plaintiff derives his under a Blunston's license, dated in 1734 and 1735; a small improvement in 1735; a survey on the 19th of June, 1764, and a patent on the 23d of April, 1789. The defendant claims under two warrants issued in 1743; one to Armstrong, who transferred his right to Robert Dunning, and the other to Robert Dunning; payment of £12. 10s. in part of the purchase money; a survey in 1744, not made out by the surveyor, or returned, at any time, into the land office; and a survey on the 19th of June, 1764, which refers to the former survey, as to a part of the land, and comprehends another parcel, then taken into the last survey. The Calhoun title then, being the eldest, must prevail against its opponent, unless it was parted with, and acquired by Dunning, abandoned, or its priority lost by want of diligence in perfecting it.

1. It is insisted by the defendant's counsel, that the jury are at liberty, and ought to presume, that such a transfer, at least by parol, was made to Robert Dunning; and that the abandonment of Calhoun of his improvements, his total indifference about the land for so many years, and the long possession of Dunning; afford a fair and legal ground for this presumption. If the last ground, upon which the presumption is rested, were made out by the evidence in the cause, the argument would, at least, have something to stand upon; as it is not to be questioned, that a long and uninterrupted possession consistent with the conveyance, the existence of which at a former period is asserted, will justify a jury, and even the court, in presuming that it once did exist. But in this case, there is no positive evidence that possession of this land was ever taken by Robert Dunning, or by his son John, before the year 1754 or 1755, unless you should think that an earlier possession is proved by James Foley. But, even if such a possession be proved, still a continuance of it is not; and even if it were, still the acknowledgment by Dunning of the Calhoun title in 1755, and the surrender of his possession taken in that year, would be abundantly sufficient to repel any presumption which a prior possession might have warranted. If a transfer by Calhoun of his title to Dunning had, in fact, been made, it would have given the latter a complete title against Calhoun in 1755, and was very improbable that the acknowledgment and surrender, then made by him, would have taken place.

2. We understand an abandonment to be a voluntary relinquishment of a man's equitable right to land, thereby leaving it vacant and open to future appropriation by others who should be inclined to take it up. The evidence of such a relinquishment may sometimes be so clearly demonstrated by the acts of the party, as to leave no doubt that such was his intention; as if a mere settler should leave the land, and remove to, and make a settlement elsewhere. Most frequently, however, the intention to abandon his right, is to be gathered from a variety of circumstances added together, no one of which might be sufficient to establish the fact. The inquiry for the jury in such cases must be, whether the circumstances proved in the cause, such as the acts or omissions of the party, afford a fair ground for presuming that such was his intention. For if, in the opinion of the jury, such an intention might justly be inferred by a person who subsequently appropriated the land, the title of the latter ought to be supported, although proof should be given of declaration to the contrary, by the owner of the prior equitable title.

Before I proceed to state the circumstances in this case from which an abandonment may be presumed, it will be proper to lay down two principles which we hold to be perfectly clear. The first is, that abandonment does not, per se, so absolutely and irrevocably destroy the equitable interest of the party, as to require a new contract with the government, in order to enable him to resume his rights, if he shall go on, and consummate his title, before any other person has taken advantage of his abandonment. There is a locus penitentiae existing in his favour, and if he shall afterwards proceed to make his survey, return it, and pay the purchase money before any other title has intervened, no subsequent appropriator can disturb him. So, if a settler were to abandon his settlement, but should afterwards return, renew his settlement, and complete his title, it could not be impeached by a subsequent warrant holder. 2. If, after the abandonment, or even before a third person should obtain a title, by warrant, or otherwise, for the land which he in like manner abandons, and the owner of the elder title should proceed to perfect his title, he would prevail against the subsequent appropriator. This proposition

is, in truth, a corollary from the first: for if abandonment do not amount to a total extinguishment of the title, so that it may be resumed with the consent of the state, if not to the prejudice of a subsequent appropriator, the latter, who has also abandoned, can have no equity against the owner of the prior right, and consequently nothing to oppose to his legal title.

In this case, each party charges his adversary with an abandonment, so that the jury will have to decide whether the charge is fairly imputable to both, or to either of the parties.

1. As to the Calhoun title. This commenced in 1734, and was followed up the next year by an inconsiderable improvement, which, in the same year, Calhoun deserted, and returned to his place of residence in a distant country, having employed and paid a man to enclose and plough the small piece of ground which he had cleared, but which, it would seem, was never done. From that time, to the period of his death, we never hear of John Calhoun, who died in the year 1752, nor of his family, after his death, before the year 1755, when the first ejectment was brought against Dunning. During the lapse of these twenty years, we are not informed that the Calhouns ever took, or attempted to take possession of this land, themselves in person, or by a tenant, or agent, ever exercised any one act of ownership over it, or even asserted a claim to it. In addition to this apparent indifference respecting the property, the defendant's counsel have argued, with much force, the total relinquishment of the improvement which Calhoun had once made on the land. Now, although we have from Chief Justice Shippen (4 Yeates, 13) the character of a Blunston's license, and entirely agree with the plaintiff's counsel, that settlement and improvement were not imposed by that instrument as conditions necessary to be performed in order to validate the title: it is still fair to contend, that if Calhoun thought otherwise, or from other motives was induced to make the improvement, his subsequent desertion of it is a circumstance, in connection with others, to show his intention to relinquish his right altogether to the land. It is, however, but a circumstance, to be weighed by the jury, in common with the other parts of his conduct before detailed. As to the two warrants granted to Calhoun for land in other places in 1737 and 1750, we think that they do not warrant any inference whatever, of an intended abandonment of this land. The first of these warrants is for an improvement made prior to 1734, and the latter speaks expressly of an improvement which one Daugherty had presumed to make. But the conclusive answer is, that, as Calhoun was not obliged, under his license to improve and settle; the improvements referred to in these warrants, even if they had been his own, would furnish no ground for inferring an intention to abandon his right under the license.

We come next to consider the alleged abandonment by the Dunnings. The warrants under which they claim were granted in 1743, and part of the purchase money was then paid. The lines were run in 1744, but no regular survey was made out, or returned into the land office at any time. No further step was taken towards perfecting the title until the 19th of June, 1764, when a regular survey was made for both Dunning and Calhoun. No possession was taken, or act of ownership exercised over the land by the Dunning family until 1755, unless the jury should consider an earlier possession as being proved by James Foley. But the strong circumstances of abandonment relied upon by the plaintiff's counsel, in addition to what has been mentioned, are, the acknowledgment by Dunning, in 1755, of the title of Calhoun; his relinquishment of the possession in consequence of that acknowledgment; and his leaving the land vacant from that time until the year 1764, when he sold to Foley; with the additional circumstance, that he too, like Calhoun, deserted, in the summer of 1755, an improvement and settlement which he had commenced in the spring of that year. It is not my intention to draw a comparison between the circumstances tending to prove the alleged abandonment by these parties for the purpose of showing on which side the weight preponderates, considering the jury to be exclusively the judges of that matter. But it is proper to state, that if you should be satisfied from the evidence furnished by Cookson's field notes that no surveys were made on the west side of the Susquehanna before the year 1742, then, in measuring the length of time during which Calhoun was chargeable with laches, you should commence with that year, and then the difference between the two parties, as to time, will be little more than a year. It is proper further to observe, that to warrant a presumption of abandonment, stronger evidence should be required in some cases than in others. Slight circumstances may be sufficient to show an abandonment of a settlement right, inasmuch as the act of settlement and improvement constitutes the whole of the inceptive title, and when the owner of it turns his back upon his settlement, and removes to some other spot, his intention to relinquish his right to his first settlement is demonstrated by the mere act of removing and settling elsewhere. Stronger evidence of such intention should be required where the title depends upon a written contract between the individual and the proprietary, as in the case of the holder of a Blunston's license. Still stronger, we conceive, would be necessary in the case of a warrant holder, who has paid part of the purchase money, and who would not be likely, intentionally, to relinquish his right to the land, and also to the money which he

had paid. And if a warrant holder, who has had a survey made and returned, and has paid the whole of the purchase, can abandon, (which the court questioned in the case of Lanning v. London [Case No. 8,074], though we understand the judges of the supreme court of this state do not question it,) the evidence must certainly be of such a character as to leave not a doubt about the intention, since a man must be under an unaccountable infatuation who, after having perfected his title except to the mere form of a patent, should voluntarily give it back to the state to grant away to others. If, upon the whole, the jury should be of opinion that the right of Calhoun was abandoned, then the plaintiff's paper title cannot prevail against that of the defendant, unless the Dunning title was also abandoned; and in that case, the title of Calhoun having been subsequently confirmed by the state, and advanced to a legal title, it cannot be impeached by the Dunning title.

3. The last objection to the plaintiff's title, is the want of due diligence in perfecting it by a survey and payment of the purchase money. It must be admitted, we think, that Calhoun was clearly obnoxious to this charge, and there can be as little doubt of the law applicable to such a case. The owner of a merely equitable title to land, derived from the proprietary, was bound to use due diligence in having it surveyed and returned into the land office, and perfecting his right, if not by a patent, at least by the payment of the purchase money. Nevertheless, if he failed to perform all or any of these acts, and the proprietary did not take advantage of his laches by granting a vacating warrant to some other person; or no other person had in the mean time acquired a right to the land, no length of time, during which his negligence might continue, would deprive him of his equitable title, which he might, at any time, convert into a legal one as against all subsequent appropriators. But if a junior right should intervene, and be followed up with due diligence, it would take precedence of the elder equitable title, inasmuch as the equity on which it is founded would be superior to that of the elder title, and it would have also the law in its favour. But this preference of the junior title can be claimed only when due diligence has been used to give it a legal character, according to the understanding of that term in Pennsylvania, and where it has been required bona fide, and without notice of the elder equitable title. This is the doctrine of courts of equity; I understand it to be that of the courts of this state, and I am almost ashamed to say that it has long been the doctrine of this court, in ejectment cases. It is not the doctrine of which I am ashamed, for none can be better founded on the great principles of justice than it is; but it is purely of an equitable nature, and is properly cognizable only on the equity side of the court. This is a very different case from one where the objection to the title is founded on abandonment, or a nonconformity to the law in the steps preceding the granting of the patent. These are legal objections to the patent itself, which is only prima facie evidence of the regularity of those proceedings. The case supposed, and which I think is altogether of equity jurisdiction, and belongs properly to that side of the court, is that of an elder equitable title opposed to a junior equitable title, clothed with an elder legal title. That is not the present case, as Calhoun had not only the prior equitable title, but also the legal title, and Dunning was, as is proved, and was admitted by the defendant's counsel, to be a purchaser of his warrant with notice of Calhoun's title. I can only say, in defence of the practice of this court in admitting these equitable considerations in trials of titles at law, that I considered it to be so settled at a very early day, and that the objection to it has in no one instance been made. It is now so ancient and inveterate, that we are not disposed to change it. It is proper at the same time to observe, that cases of this kind will not be considered as precedents for others not precisely like them, and that the equity side of the court, which is on all accounts best adapted to their investigation, is still open to the claim of a prior equitable title against a prior legal title, founded on a junior equitable one. The court is therefore of opinion, that the defendant has no equity to oppose to the plaintiff's title, so as to give him a preference on either side of this court. The notice however which deprives him of that equity has nothing to do with the subject of abandonment, as a man may lawfully appropriate land which another has abandoned, although he had full notice of his title previous to the abandonment. As some of the arguments of the plaintiff's counsel were founded upon the recitals or statements to be found in the decision or order of the board of property, it becomes our duty to say, that we do not, in this case, consider that decision as evidence of the facts it recites.

4. The next objection to the plaintiff's right to recover in this ejectment is, that his title is merely equitable, since he has produced no deed from Calhoun or his representatives to Caruthers. But we are of opinion that after so long a possession, uninterrupted by the family of Calhoun, or by any other person claiming under them, the law presumes that a conveyance was made, which by some accident may have been lost or destroyed, more particularly, as it was proved that all the purchase money was paid by Caruthers, and, by the articles of agreement between him and Calhoun, the conveyance was to be made when the purchase money should be paid.

5. The last point to be decided is the title of the plaintiff, founded upon length of possession. The position of the plaintiff's counsel, that an adverse possession in the defendant, for the length of time which will prevent

a plaintiff from recovering in ejectment, will also give to the plaintiff, who has had such a possession, right upon which he may recover, is unquestionable law. To defeat this right when asserted and proved by either the plaintiff or defendant, the adverse party must prove either a suit brought, or an entry made, within the time which the law prescribes. The adverse possession of Caruthers commenced in 1773, when John Dunning was alive. But the act of 1785 passed after his death, which happened in the year 1777. The third section declares that any person then having right of entry into land, and his heirs, might, within fifteen years from the passage of the law, enter or commence any action or suit as he or his ancestors might have done before the passing of the act. The fourth section contains the proviso saving the rights of infants and of others under the usual disabilities, and enabling him and his heirs, notwithstanding the expiration of twenty-one years from the time the right or title accrued, to bring his action, or to make his entry, so that he take the benefit of, or sue for the same, within ten years, next after such disability shall be removed. At the death of John Dunning, his sons were minors. His youngest son however came of age in the year 1793, and the ejectment under which Caruthers lost possession of the land, was not commenced until the year 1805, about twelve years after the disability of the youngest son was removed.

The only ground then upon which the right of the plaintiff, acquired by length of possession, can be resisted, is the alleged entry, as proved by James Davidson. But before we examine his evidence it will be proper to state to the jury what it is which constitutes a legal entry to avoid the bar of the act of limitations, and what the party must prove who endeavours to avoid it. Upon these subjects the law is perfectly clear. He must enter with intent to claim the possession; and he must do some act to prove that such was his intention, as by cutting a tree, digging the ground, or by other acts amounting to a trespass on the land, or he must declare that he enters for the purpose of claiming or taking possession. No particular form of words is prescribed by the law. The substantial part of the ceremony is, the taking, or declaring an intention to take, or claim the possession. It is contended by the defendant's counsel, that this is nothing but an unmeaning form, and that it is quite sufficient to prove to the satisfaction of the jury that the entry was made with an intention to claim the possession. In support of this position, the opinion of the judges of the supreme court of this state, in the case of Carothers v. Dunning, 3 Serg. & R. 373, is relied upon. If this was the opinion expressed in that case, highly as we respect the decisions of that court, we should feel ourselves under the necessity of dissenting from it; believing, as we do, that it is opposed to the

most respectable authorities, and is countenanced by none. But I feel considerable confidence in saying, that the opinions of those judges have been entirely misunderstood by the defendant's counsel. The judges below, who tried the cause, left it to the jury to decide, from the evidence given of the entry, for what purpose it was made. The chief justice says, that this point was properly submitted to the jury; and who can doubt but that it was so? There were two questions to be decided. First, the quo animo, with which the entry was made, and this "was to be inferred from the words and conduct of the person who entered." The judge could do no otherwise than leave that question to the jury. The second question was, what constituted a legal entry? The complaint of the counsel for Caruthers was, that the judge below left this matter to the jury. But the answer given by the chief justice is conclusive; the judge was not asked to give a direction to the jury, upon that point, and therefore he committed no error in not giving it. Who can doubt of the correctness of this opinion? But the judge, in no part of his decision, affords a ground for saying that he considered the intention of the entry as the only matter to be determined. He was not called upon to decide that point, and he very properly avoided it. Judge Gibson, after stating the charge of the judge, "that an entry to avoid the statute of limitations must be made by the party claiming, or some one duly authorized by him, for the purpose of taking possession," and so leaving that matter to the jury, adds "an entry for the purpose of taking possession is good, (quoad that act, as I understand the judge), and if the counsel had desired a more particular exposition of the law on the point, the opinion of the court should have been specially required, without which, no omission is error."

Understanding these judges as giving opinions in reference to the case before them, we subscribe to them entirely.

What then is the evidence given of a legal entry by Mr. Dunning? Davidson says, that he attended every year on the land, prosecuting and claiming his title to the land, that he was with him every year on the land, but could not remember what he said when he was there. Now it is to be recollected, that the burthen of proof of the fact of a legal entry is on the defendant; and if the evidence which he offers is ambiguous or unsatisfactory, he falls short of establishing the material part of his defence. Dunning might have entered upon the land from a variety of motives to prosecute and claim his title, and yet never have claimed the possession, or thought of doing so, or even known that this was necessary. The witness does not recollect what he said, and he proves no one act amounting to a claim of the possession. What he states is a mere inference of his own. If we are to interpret what the witness deposes literally, viz. that he did no

more than claim title to the land, then it is clear that he failed to make such an entry as the law requires. To say, that the form of entry required by law is absurd, or that the jury may, upon such evidence as this, infer that he entered, not only with an intention to claim the possession, but that he did in fact claim it; is to confound all the well settled distinctions of law in reference to this subject, and would lead to the most mischievous consequences. It would be to leave to a jury the decision of the most intricate questions of law, under the cover of ambiguous evidence. Whether the entry was made in a legal form or not, is exclusively a question of law, when the fact is ascertained; and we can never consent to leave the decision of that point to the jury. It is our duty to instruct this jury, that an entry upon land, be the intention what it may, by a person "prosecuting and claiming his title to the land," is not such an entry as will defeat a title acquired by length of possession under the act of limitations.

Verdict for plaintiff.